IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DAVID DOUGHERTY | : | CIVIL ACTION |
| | : | NO.  14-7270 |
| v. | : | |
| | : | |
| ALLSTATE PROPERTY AND | : | |
| CASUALTY INSURANCE COMPANY | : | |

O'NEILL, J.                                                          May 5, 2016

## MEMORANDUM

This case springs from a January 2014 water leak at a property at 407 W. South Avenue,

Glenolden, Pennsylvania owned by plaintiff David Dougherty which was insured under a policy

of insurance issued by defendant Allstate Property and Casualty Insurance Company.  Allstate

now seeks summary judgment in its favor on plaintiff's breach of contract claim and his claim

for bad faith pursuant to 42 Pa. C.S.A. § 8371.  Dkt. No. 14.  Plaintiff moves for summary

judgment in his favor on his claim for breach of contract.  Dkt. No. 17.  In addition to the parties'

motions, also before me are plaintiff's response to defendant's motion, Dkt. No. 16, defendant's

reply, Dkt. No. 18, defendant's response to plaintiff's motion, which includes a counterstatement

of undisputed material facts, Dkt. No. 19, plaintiff's response to defendant's counterstatement of

material facts, Dkt. No. 20, and plaintiff's reply, Dkt. No. 21.  For the reasons that follow, I will

grant defendant's motion and deny plaintiff's motion.

## BACKGROUND

On January 20, 2014, plaintiff reported a claim for water damage to the property to

Allstate.  Dkt. No. 17 at ¶ 2.  Allstate began to investigate plaintiff's claim thereafter.  Dkt. No.

14 at ¶ 49.  On January 21, 2014, Allstate issued a reservation of rights letter by which it

reserved its right "to later deny coverage obligation and assert a defense of no coverage under the

policy because Allstate's investigation is ongoing as to the cause of loss as well as the

verification that heat was maintained in the home." Dkt. No. 14-14.  The letter explained that Allstate would also "avail [itself] of any other policy defenses, which may arise."  Id.

Allstate ultimately denied plaintiff's claim for damages by letter dated June 9, 2014, citing both the occupancy/heat exclusion and the planning, construction or maintenance exclusion set forth in his policy.  Dkt. No. 17 at ¶ 16; see also Dkt. No. 17-10.  The letter explained that "[o]ur investigation revealed that reasonable care was not used in maintaining the heat at the loss location."  Dkt. No. 17-10 at ECF p. 3.  At his deposition, Allstate's claims adjuster explained that "[i]t's actually two different exclusions . . . that have been used" to deny coverage – a "freezing exclusion" and a "planning, construction or maintenance" exclusion.  Dkt. No. 17-9 at 33:12-14, 34:19-22 (Hanks Dep.).  He testified that Allstate "solely relied on [its] engineer and the insured's technician" in determining the basis for its denial of coverage.  Id. at 47:13-15.

The Allstate-issued insurance policy for the property provides, in relevant part:

> Losses We Do Not Cover Under Coverage A, Coverage B and Coverage C
>
> A. We do not cover loss to the property described in Coverage A - Dwelling Protection or Coverage B - Other Structures Protection consisting of or caused by the following
>
> 1. Freezing of:
>
>> a) plumbing, fire protective sprinkler systems, heating or air conditioning systems;
>> b) household appliances; or
>> c) swimming pools, hot tubs and spas within the dwelling, their filtration and circulation systems;
>
> or discharge, leakage or overflow from within a), b) or c) above, caused by freezing, while the building structure is vacant, unoccupied or being constructed unless you have used reasonable care to:

> a) maintain heat in the building structure; or
> b) shut off the water supply and drain the system and appliances.
>
> . . .
>
> C. We do not cover loss to the property described in Coverage A-Dwelling Protection, Coverage B - Other Structures Protection or Coverage C - Personal Property Protection consisting of or caused by the following:
>
> . . .
>
> 10. Planning, Construction or Maintenance, meaning faulty, inadequate or defective:
>
>> a) planning, zoning, development, surveying, siting;
>> b) design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction;
>> c) materials used in repair, construction, renovation or remodeling; or
>> d) maintenance
>
> of property whether on or off the residence premises by any person or organization.

Dkt. No. 14-2 at ECF p. 52-54.

In January, 2014, at the time of the discharge of water which is central to this action, plaintiff was living in Colorado and his home, which was being marketed for sale, was unoccupied. Dkt. No. 17 at ¶ 4. The main heating source for plaintiff's property is an oil furnace supplied by a 275 gallon oil tank. Dkt. No. 14 at ¶ 8. At the time of the leak, the service sticker on the furnace last reflected an annual service visit on January 2, 2007. Id. at ¶ 10. Plaintiff has no direct evidence of service to the furnace at the property for the years 2008 through 2013. Id. at ¶¶ 27-32. Nor has he set forth evidence that the furnace was serviced in 2014 prior to the incident. Id. at ¶ 33. Instead, plaintiff testified that when he lived at the property before moving to Colorado in 2009, he performed some maintenance on the furnace:

changing air filters due to his concerns over dust and allergies and hiring technicians who worked on the furnace when they installed a central air system.  Dkt. No. 16 at ¶ 27; Dkt. No. 16-4 at 29:8-31:8.

From October 2009 through August 1, 2011, the property was unoccupied and listed for sale or rent.  Dkt. No. 14 at ¶ 11.  On August 1, 2011, plaintiff rented the property to Barri Pepe. Id. at ¶ 12.  Plaintiff's property manager testified that the HVAC system was operational when Pepe's lease commenced and that Pepe asked for no service to the HVAC system during her lease.  Dkt. No. 16 at ¶ 18.  Under the terms of her lease, Pepe was obligated to maintain the property's heating system.  Dkt. No. 16-6; see also Dkt. No. 16 at ¶ 18.  Plaintiff and his property manager testified that Pepe represented to them that her spouse or fiancé was an HVAC technician who would do whatever work was necessary to meet her obligation under the lease agreement to supply the property with heat.  Dkt. No. 16 at ¶ 16; Dkt. No. 16-4 at 19:9-13 ("the only thing she mentioned to me about her husband was that he was an HVAC technician, had a full-time job, and he was helping maintain some of the property"); Dkt. No. 16-5 at 16:7-18 ("Barry [sic] had informed us her fiance [sic] was an HVAC contractor or worked for an HVAC company and any time that repairs or something like that was needed, Barry would call me and then . . . she called me back and said my husband or fiancé already took care of it"). Nevertheless, there is no testimony of record from Pepe or her spouse/fiancé or any other evidence regarding any service that may have been performed on the furnace during her tenancy.

Plaintiff evicted Pepe from the property on or about April 1, 2013, as Pepe had been subletting the premises to others in violation of her lease agreement and Glenolden Borough's requirements.  See Dkt. No. 14 at ¶ 13; Dkt. No. 16 at ¶ 13.  After the eviction, the property was again listed for sale.  Dkt. No. 14 at ¶ 19.  Plaintiff's property manager testified that "the HVAC

was in working condition when Pepe vacated the premises."  Dkt. No. 16 at ¶ 18.  However, plaintiff was not aware of how much oil was in the tank at the property when Pepe was evicted. Dkt. No. 16 at ¶ 21.  He does not dispute that he did not have any oil delivered to the property after April 2013.  Dkt. No. 14 at ¶ 20.

On April 8, 2013, plaintiff received a document from his realtor which advised him to "winterize" the property for the cold months by "a licensed plumbing and heating contractor to minimize the potential of freezing pipes" in the event his property "may be vacant during periods of cold weather."  Dkt. No. 14 at ¶ 23; Dkt. No. 14-7.  Despite this advice, plaintiff did not have a plumber or heating contractor winterize the property after Pepe's eviction.  Dkt. No. 14-4 at 182:13-183:3.

Sometime on or before January 7, 2014, plaintiff emailed his neighbor Michael Bergen asking him to visit the property explaining that, "[l]ike the schmuck I am, I just realized that the heat is probably NOT turned on in my house!""  Dkt. No. 14-10 at ECF p. 3.  He wrote, "[h]opefully my pipes are not broken?  The water was supposed to be off,[1] but since that leak outside recently it must still be active?  I really need to stay up on these things.  I am interviewing property management companies to rent it again, but finding it harder than expected."[2]  Id.  Bergen testified that on January 7, 2014[3] he "checked on plaintiff's unoccupied

---

[1]    Plaintiff testified that "I did assume for the longest time that [the water] had been shut off," Dkt. No. 14-4 at 113:5-7, but also that he knew as of January 7, 2014 that there was water in the pipes.  Id. at 113:17-20.

[2]    Plaintiff emailed a copy of this email to his public adjuster on April 11, 2014, explaining,

> [y]ou can see why I didn't want to give Allstate a copy of my original request to my neighbor, as I sound as if I feel I have neglected the place.  On the other hand, maybe this email shows that I am concerned and making efforts to secure and protect the house, which of course I was.  I just wished I had worded it

home and confirmed that the heat was on, the furnace was working, the temperature was approximately 50 degrees Fahrenheit, and there was no water damage in the home."  Dkt. No. 17 at ¶ 12.  He testified that he did not go to the second floor of the property and that he could have been at the property for five minutes or less.  Dkt. No. 14 at ¶ 41.

Just ten days later, on January 17, 2014 plaintiff's realtor Danny Cachuela discovered water damage at the home.[4]  Id. at ¶ 3.  He called plaintiff and reported that water at the property was "gushing from the 2nd floor and the ceiling and floors are completely water logged and falling apart."  Dkt. No. 14 at ECF p. 7.  That day, plaintiff sent an email to Kevin Kennedy, a public adjuster.  Dkt. No. 14-8; see also Dkt. No. 17-3 at ECF p. 16 (Trans. p. 57:9-15).  He explained, "I just received a call from my realtor saying there was water gushing from the 2nd floor and the ceiling and floors are completely water logged and falling apart."  Dkt. No. 14-8.  Plaintiff reminded the adjuster that plaintiff had previously contacted him about water in the basement at the property, but it had been decided that the basement "was not an insurance issue."  Id.  Plaintiff then wrote, "[h]opefully, this one is?"  Id.  He noted that he could "not find my copy of my policy and ha[d] not contacted my insurance agency yet (Allstate)."  Id.

The next day, plaintiff retained a restoration company to assist with cleaning and drying the property.  Dkt. No. 17 at ¶ 6; see also Dkt. No. 14-5 at ECF p. 4 (plaintiff's answer to

---

different at the time."
Dkt. No. 14-10 at ECF p. 2.

[3]      On April 11, 2014, plaintiff emailed his insurance adjuster a copy of "the 'actual' original email that [he] sent to [his] next door neighbor to ask him to check in on [his] house."  Dkt. No. 14-10 at ECF p. 2.  Plaintiff wrote that "[i]t is dated Jan. 7th 2014 as is his response."  Id.  In a March 6, 2014 email, Bergen had offered to "change the dates of his visit to the Property for Plaintiff as he didn't 'know if the dates jive with what you [Plaintiff] are telling [Allstate] now.'"  Dkt. No. 14 at ¶ 43.  He later testified that "[l]uckily . . . I wasn't put in that position" of being asked to change the date.  Id. 14 at ¶ 9.

[4]      Plaintiff's complaint in this action alleges that the water damage occurred "on or about January 18, 2014," not January 17.  Dkt. No. 14-1 at ¶ 9.

defendant's interrogatory identifying "ServiceMaster by ARTec" as having been retained on

"1/19/2014" for "whole house drying and dehumidification totaling $2,136.46); Dkt. No. 14-6

("I have Steve Stahltrager from Service Master by Artec involved for the water cleanup."

On January 19, 2014, in another email to his public adjuster, plaintiff said that he "had a

guy look at the furnace and he also determined the [oil] tank was empty."[5] Dkt. No. 14 at ¶ 45;

see also Dkt. No. 14-12. He wrote that the unidentified guy[6] "did say it was possible that

---

[5]        Plaintiff objects that "the material relied on to support this assertion is not
admissible in evidence." Dkt. No. 16 at ¶ 45. He contends in general that "private electronic
correspondence between himself and his public adjuster is not relevant evidence because the
emails do not relate to any fact that is of consequence in determining this action." Id. at ¶ 14; Id.
at ECF p. 40. Plaintiff argues that because "Defendant admits that it did not rely upon this email
communication when it denied Plaintiff's claim and Plaintiff did not offer the email in support of
his request for coverage, the email is irrelevant as if is no consequence in determining the
action." Dkt. No. 16 at ECF p. 40. Plaintiff further argues that the emails' "probative value is
substantially outweighed by the danger of confusing the issues, misleading the jury and unfair
prejudice to the Plaintiff." Id.
        Defendant responds that the emails in question "constitute, among other things:
admissions or statements by a party opponent; statements against interest; and/or present sense
impressions concerning relevant issues involving Plaintiff's lack of maintenance to the Property,
the Plaintiff's furnace as well as Plaintiff's lack of good faith in dealing with Defendant
Allstate." Dkt. No. 18 at ECF p. 7-8.
        Plaintiff's communications with his public adjuster are not privileged and they are
relevant to Allstate's defenses as they provide insight into plaintiff's efforts to maintin his
property and also into whether he provided sufficient information to defendant to permit it to
perform the required investigation of his claim. I find that their probative value is not
outweighed by the danger of confusing the issues, misleading the jury or unfair prejudice to
plaintiff. Accordingly I decline to exclude them from consideration in reaching my decision on
summary judgment.
[6]        Plaintiff testified that he could not recall the identity of the "guy" referenced in
the email. Dkt. No. 16-4 at 66:25-67:3. He explained,

        I'm not sure who would've looked at the tank. That first couple of
        days I had a lot of people that had to come in and do emergency
        shut-offs and clean up. . . . So to the best of my knowledge that
        could've been a completely unqualified guy who just came in and
        was cleaning stuff up and probably said, "Your tank might be
        empty."

Id. at 67:18-68:3.

'sludge' from sediment in the bottom of the tank could have caused the shutoff."  Id.  Plaintiff

noted that "[e]veryone seems to agree that [my insurance company] will not cover the damage

since the oil was allowed to run dry?"  Id.  Plaintiff testified that this statement was based on "an

assumption at the time that that was a possible cause of the furnace shut-down."  Dkt. No. 17-3

at 72:5-11.

Plaintiff then contacted Allstate on January 20 to make his claim.  He emailed his public

adjuster that day explaining:  "I told the insurance company just what we know for certain, water

line broke on the 2nd floor and there is much damage.  They asked if it was frozen pipes and I

said I had no idea, but that the thermostat was set at 52 degrees."  Dkt. No. 14-6.  Plaintiff

testified that he did not believe he ever mentioned to Allstate that a pipe froze and burst.  Dkt.

No. 17-3 at 73:23-74:2.

Also on January 20, Allstate's representative emailed its investigator about the property,

explaining:

> Service Master by ARTEC was called out by Mr. Dougherty –
> Steve is the tech that inspected . . . – per Steve the break appears to
> be on the 2nd floor – perhaps supply line from the bathroom.  Mr.
> Dougherty noted that he had the water turned off, but also thought
> Aqua turned off the water shortly after the tenants left the property
> in April 2013.

Dkt. No. 16-16 at ECF p. 2; see also Dkt. No. 17-2 at ECF p. 1 (January 20, 2014 claims entry by

Tracy E. Miller stating that "the failure of the water line is clearly from the 2nd floor – no visible

broken pipes – appears may be from vanity in bathroom – all carpets on 2nd floor wet – leaking

to 1st floor – Steve's plan would be to get temp electric – then inspection from PECO to start dry

out").  Plaintiff testified that the second floor bathroom is the only source of water on the second

floor.  Dkt. No. 17-3 at 50:3-6.  In his answer to defendant's interrogatories, plaintiff wrote that

his "home was damaged by a water leak from the bathroom on the second floor of the home."

-8-

Dkt. No. 14-5 at ECF p. 4.  There is no evidence regarding whether plaintiff replaced any pipes at the property after the leak.  See Dkt. No. 16-5 at 59:9-15 (Maguire Dep.); Dkt. No. 16-11 at 59:15-17 (Bergen Dep.).

In a January 21 email to Allstate, plaintiff wrote "We also need to see why the pipe broke in the first place?  I noticed on my claim that you wrote that the cause of the break was freezing pipes without the pipes even being inspected yet or determining for certain that the cause was frozen pipes due to the furnace running out of fuel."  Dkt. No. 14-15.  At his deposition, plaintiff testified that "I don't dispute that it was water-freeze.[7]  I just said it's yet to be – it's never been determined that for a fact. . . . The cause of – of the location, the pipe, has never been determined what had broken or been researched."  Dkt. No. 17-3 at 94:20-95:12.  With respect to its investigation of the source of the leak, Allstate's claims adjuster explained, "there was never a question [as to whether there were freezing pipes] so Allstate did not investigate that further."  See Dkt. No. 17-9 at 52:5-10.

Plaintiff had 100 gallons of oil delivered to the property on January 21, 2014.  Dkt. No. 14 at ¶ 10.  Also that day, plaintiff wrote to his public adjuster that Allstate had asked him for "copies of his oil, water and [electric] bills."  Dkt. No. 14-15.  Plaintiff continued, saying "I told her that I had a tenant who was responsible for filling the tank and have no way to determine who she used.  Fact is, she may have never had any oil delivered, but we don't know that for certain?"  Id.  He explained that "I did tell [Allstate] that I scheduled an oil delivery for today, but never mentioned that the tank was empty.  Just that I was advised by [Service Master] to put some oil in for when we start the furnace back up."  Id.  Plaintiff then posited the following: "Even if my furnace did run dry, my pipes may show a different story?  The lady renting my

---

[7]        The February 4, 2014 contract plaintiff executed with his public adjuster states that it is for a "water freeze" matter.  Dkt. No. 14-3.

place had 7 women living there for almost 2 years sharing 1 bathroom.  Who knows what that kind of overuse might have done?"  Id.

Allstate retained an independent engineer, Fredric M. Blum of Paul Zamrowski Associates, Inc. to inspect plaintiff's property.  Dkt. No. 14 at ¶ 52.  Blum visited the property to conduct an investigation on February 11, 2014, after the 100 gallons of oil had been delivered.  Id. at ¶ 54; see also Dkt. No. 17-8 at ECF p. 1.  Blum also spoke with plaintiff by telephone on February 11, 2014.  Dkt. No. 14 at ¶ 54.  When plaintiff spoke with Blum, he told Blum that he thought the water to the Property had been shut off before January 18, 2014.  Id. at ¶ 55.  However, based on his prior email to his neighbor, plaintiff was aware at the time that water was being supplied to the property prior to January 18, 2014.  Id.

Blum submitted an engineering report to Allstate on February 12, 2014, "document[ing] the results of [his] investigation of the incident of January 18, 2014 in which the house owned by [plaintiff] . . . was damaged by water emitted from a burst pipe."  Dkt. No. 17-8 at ECF p. 1.  Blum found "no evidence of exhaust or soot emission . . . on the front of the furnace or flue pipe" and that "the optical flame sensor is clean . . . which means draft has probably been satisfactory."  Id. at ECF p. 2.  But he also found that "[t]he interior of the burner contains some soot which would comport with long term lack of maintenance . . . ."  Id. at ECF p. 2-3.  When Blum checked the fuel supply, "substantial outflow confirmed that the tank does in fact contain oil," which "comports with oil being delivered after the incident and also means the tank gauge is faulty."  Id. at ECF p. 3.  He explained that "the fuel line was then disconnected at the oil burner, and no oil was emitted, nor was any observed inside the end of the line . . . .  This result means the tank ran out of oil."  Id.  He wrote that "[w]hen a tank runs out of oil, the oil line to the burner becomes empty – filled with air.  After oil is delivered, the line must be purged of oil

in order for oil to flow to the burner." Id.  Blum concluded "[t]o a reasonable degree of engineering certainty based on present evidence, and information, and subject to revision if additional information is received in the future" that "[t]he incident was caused by the heating system running out of oil which allowed the house to freeze."[8] Id. at ECF p.4.

Sometime thereafter, in an undated letter to plaintiff, Service Manager Andrew Keegan of RADAC Services wrote, "[a]fter reviewing the engineering report you sent me, I have to disagree with its findings." Dkt. No. 14-19.  He explained "I do not believe you ran out of oil" and concluded that "[a]t the time of failure there was approximately 30 gallons of oil in the tank." Id.  He noted that

> [a]s for the report[']s findings that there was no oil in the line at the burner, you could expect to see that, as the filter clogged to the point that it restricted the amount of oil passing through it.  The pump was pulling the remaining oil and debris in the line until the nozzle clogged and shut off the burner.  At that point, any oil in the line at the pump would have settled down the line . . . ."

Id.  He thus concluded that plaintiff's furnace "failed due to a clogged oil nozzle and clogged oil filter." Id.

When Keegan transmitted this letter to plaintiff on March 9, 2014, he did so via an email message in which he wrote that "Your furnace was in dire need of service – the heat exchanger and chimney were almost completely clogged with debris and soot.  The white bag [in the attached photo] is full of soot and debris removed from the chimney and furnace.  I cleaned everything and replaced the needed parts." Dkt. No. 14-21; see also Dkt. No. 17-3 at 121:24-122:13.  In a subsequent email transmitting Keegan's email and letter to his public adjuster,

---

[8]      Blum also concluded that "[l]ittle or no water damage would have occurred in consequence of the incident if Aqua America had not failed to close the street valve after Mr. Dougherty closed the account." Dkt. No. 17-8 at ECF p. 4.  Plaintiff testified, however, that he did not drain the house or any of its appliances of water prior to the incident. Dkt. No. 17-3 at 117:20-23.

plaintiff wrote "I tried to save just the letter to send to you separately because I don't think Allstate needs to see his comments about the furnace being in dire need of service he wrote in his message.  However, I was having trouble putting it in a separate file . . . ."  Dkt. No. 14-21; Dkt. No. 17-3 at 118:14-24.  Plaintiff testified that because Keegan's comments about the need for service were not in his report, he did not believe that Allstate needed to see the comments.  Dkt. No. 17-3 at 123:19-23; see also id. at 126:8-24 ("I didn't see it as relevant.").

In a second undated letter, Keegan wrote to plaintiff that he had been to the property "to check the furnace."  Dkt. No. 17-7.  He "found that the burner nozzle was clogged, and there was oil in the nozzle tube.  With this information [he] determined that the failure of the furnace was due to a clogged nozzle, due to debris in the oil not removed by the oil filter."  Id.  He also "measured the oil in the tank and had 21" of oil, or about 130 gallons."  Id.

On May 28, 2014, Blum submitted a supplemental engineering report to Allstate "based on additional information received subsequently, specifically, the report by service contractor Andrew Keegan of RADAC Services and information obtained from Mr. Keegan by telephone." Dkt. No. 17-11 at ECF p. 1.  Blum wrote that "the tank must have contained 30 gallons at the time of the incident" given Mr. Keegan's conclusion that the tank contained 130 gallons at the time of his service visit and his measurement of "the actual depth of the oil in the tank, which correctly corresponds to 130 gallons."[9]  Id.  Blum noted that "Mr. Keegan said that to start the burner, he opened the air vent on the burner's oil pump to allow any air in the oil line to escape" and that "only a small volume of air vented which was no more than the usual volume from filter replacement."  Id.  Blum wrote that, "[b]y contrast, if the tank had run out of oil, the entire oil line would have been empty and a considerably larger volume of air would have vented."  Id.

---

[9]     Allstate's expert and plaintiff's HVAC technician thus agree that Plaintiff's oil tank contained approximately 30 gallons of oil at the time of the water leak.  Dkt. No. 16 at ¶ 21.

"Based on this information," Blum "concluded that the tank did not run out of oil, rather that the incident is attributable to severe clogging of the oil supply system (the filter and/or the nozzle). The clogging prevented oil flow in the line which I observed during my inspection." Id. at ECF p. 2.  Blum then noted that Allstate had "advised that the furnace was last serviced in 2007." Id. He noted that "no maintenance since 2007 – seven years prior to the incident – represents gross lack of proper diligence on the part of the owner." Id.  Blum thus revised his prior opinion and concluded that "[t]he incident is attributable to an accidental malfunction of the furnace caused by clogging of the oil supply system" and "[t]he incident would not have occurred if the owner had not failed to maintain the furnace in reasonably timely manner."[10]  Id.

While plaintiff waited for Allstate's final coverage determination, he expressed frustration with the amount of time it was taking.  On March 23, he emailed his public adjuster explaining that he had spoken to a customer who suggested that he consider "send[ing] a letter to Allstate threatening a 'bad faith claim' since they have done nothing and have not offered any explanation for taking so long to handle the claim."  Dkt. No. 14-22,  On March 26, he closed an email to his public adjuster with the caveat that he was "ready for a fight" because he was "getting very impatient and stressed at their delay."  Dkt. No. 14-23.  He emailed his public adjuster again on April 7 to check on the status of his claim, explaining that "I most certainly plan on making them PAY for this continued delay.  I still may end up suing them even if they accept the claim at this point?"  Dkt. No. 14-25.  On April 15, his public adjuster emailed to ask for additional information with respect to maintenance, noting that "Allstate is and continues to be predisposed to deny this claim."  Dkt. No. 14-26 at ECF p. 2.  Plaintiff responded that

---

[10]      Blum reiterated his conclusion that "[l]ittle or no water damage would have occurred in consequence of the incident if Aqua America had not failed to close the street valve after Mr. Dougherty closed the account."  Dkt. No. 17-11 at ECF p. 2.

> I am insured . . . period!  Regardless of the cause, I am insured
> against damages and that is all this boils down too [sic].  If they
> want to argue, they can do it in court.  If they feel they need these
> records as some kind of "proof", they can see them in court.  I am
> not doing another thing to waste my time helping them.
>
> Bottom line, I can most likely get copies of all my maintenance
> records, but I'm not going too!  [sic]  I will have them by the time
> this goes to court if need be though.  This is ridiculous.

Id.  On May 17, plaintiff wrote that he was "ready to throw down."  Dkt. No. 14-29.  He told his

public adjuster that he had spoken to "several lawyers" and had selected one to proceed with a

claim against Allstate.

After Allstate's June 9, 2014 coverage denial, plaintiff initiated this action in the Court of

Common Pleas for Philadelphia County on November 17, 2014 and defendant removed the case

to this Court on December 24, 2014.

## STANDARD OF REVIEW

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on

file, and any affidavits show that there is no genuine issue as to any material fact and that the

movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2);  see Celotex Corp. v.

Catrett, 477 U.S. 317, 322-23 (1986).  A dispute as to a material fact is genuine if "the evidence

is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v.

Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).  A fact is "material" if it might affect the

outcome of the case under governing law.  Id.  In deciding a motion for summary judgment, a

district court considers the facts drawn from "the pleadings, the discovery and disclosure

materials, and any affidavits" and must "view the inferences to be drawn from the underlying

facts in the light most favorable to the party opposing the motion."  Fed. R. Civ. P. 56(c); Curley

v. Klem, 298 F.3d 271, 276-77 (3d Cir. 2002) (internal quotations omitted).

-14-

If the movant sustains its burden, the nonmovant must set forth facts demonstrating the existence of a genuine dispute.  See Liberty Lobby, 477 U.S. at 255.  The adverse party must raise "more than a mere scintilla of evidence in its favor" in order to overcome a summary judgment motion and cannot survive by relying on unsupported assertions, conclusory allegations, or mere suspicions.  Williams v. Borough of W. Chester, 891 F.2d 458, 460 (3d Cir. 1989); see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) (stating that the opponent of summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts.").  In the end, the Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Liberty Lobby, 477 U.S. at 251-52.

## DISCUSSION

### I.   Breach of Contract

Both plaintiff and defendant seek summary judgment in their favor with respect to plaintiff's claim for breach of contract.  "[W]hen the insurer relies on a policy exclusion as the basis for its denial of coverage, the insurer has asserted an affirmative defense and bears the burden of proving the exclusion." Erie Ins. Grp. v. Catania, 95 A.3d 320, 322-23 (Pa. Super. Ct.), appeal denied, 104 A.3d 4 (2014).  It follows that defendant can prevail on its motion if it can show that there is no material question of fact that it properly denied coverage under the either the occupancy/heat exclusion or the maintenance exclusion.[11]  Plaintiff can prevail on his

---

[11]      I disagree with plaintiff's contention that in order to prevail on summary judgment it is defendant's "burden to come forward with evidence to establish that Plaintiff's loss was caused by freezing." Dkt. No. 21 at ECF p. 5.  Defendant did not base its denial of coverage solely on the occupancy/heat exclusion, but rather, also denied coverage on the basis of the maintenance exclusion in plaintiff's policy.  Plaintiff's breach of contract claim will fail if

motion if he can show that there is no material question of fact that defendant has not met its burden to show that it properly applied either the occupancy/heat exclusion or the maintenance exclusion.[12]  For the following reasons, I find that defendant has met its burden to show that it properly applied the maintenance exclusion to bar coverage for plaintiff's claim and that plaintiff has not set forth sufficient facts to demonstrate the existence of a genuine dispute.  It follows that summary judgment is warranted in defendant's favor on plaintiff's breach of contract claim.

---

defendant can meet its burden to prove *either* exclusion.

[12]        Plaintiff argues that Allstate should have instead applied the "wear and tear exclusion" set forth in the policy.  Dkt. No. 21 at ECF p. 6.  Under that exclusion, plaintiff contends he would have had coverage for direct physical damage caused by the release of water at his property.  Id. at ECF p. 5.  It provides that:

> We do not cover loss to the property. . . consisting of or caused by the following:
>
> 7.        a)        wear and tear, aging, marring, scratching, deterioration, inherent vice, or latent defect;
>
>           b)        mechanical breakdown
>
>           . . .
>
>           If any of a) through g) cause the sudden and accidental escape of water or steam from a plumbing, heating or air conditioning system, household appliance or fire protective sprinkler system, we cover the direct physical damage caused by the water or steam.  If loss to covered property is caused by water or steam not otherwise excluded, we will cover the cost of tearing out and replacing any part of your dwelling necessary to repair the system or appliance.  This does not include damage to the defective system or appliance from which the water escaped.

Dkt. No. 14-2 at ECF p. 51-53.

        Because Allstate did not rely on this exclusion in denying coverage to plaintiff, it would be plaintiff's burden – and not Allstate's – to prove the applicability of the wear and tear exclusion.  Plaintiff has not met this burden as he has not set forth any evidence to show that the leak at the property was caused by wear and tear, aging, latent defect or mechanical breakdown causing a sudden and accidental escape of water from his plumbing.  Rather, the evidence before the Court, including the conclusion of plaintiff's own expert, supports a conclusion that the incident was caused by a failure to maintain the furnace at the property.

-16-

In pertinent part, the maintenance exclusion provides that Allstate "do[es] not cover loss to the property . . . consisting of or caused by . . . faulty, inadequate or defective. . . maintenance of property whether on or off the residence premises by any person or organization."[13]  Dkt. No. 14-2 at ECF p. 52-54.  Defendant thus contends that "it was Plaintiff's contractual responsibility to use reasonable care to maintain heat at the Property, and losses consisting of or caused by faulty, defective or inadequate maintenance at the Property are excluded."  Dkt. No. 18 at ECF p. 5.  In support of its motion, defendant points to the reports prepared by both its expert, Blum, and plaintiff's expert, Keegan, who each concluded that "the furnace failed due to a severely clogged nozzle."  Dkt. No. 14 at ECF p. 22.  Keegan found that because of the clogged furnace filter, "the pump was pulling the remaining oil and debris in the line until the nozzle clogged and shut off the burner."  Dkt. No. 14-19.  Blum concluded that the "incident is attributable to an accidental malfunction of the furnace caused by clogging of the oil supply system" and that it

---

[13]      Plaintiff also contends that Allstate's application of the maintenance exclusion is improper because "Pennsylvania law is clear that Plaintiff's oil burning furnace is not property," rather, he contends his "furnace is properly classified as a fixture and thus [is] not subject to the policy exclusion" for maintenance.  Dkt. No. 16 at ECF p. 37; see also Dkt. No. 21 at ECF p. 6. (arguing that the maintenance exclusion "is being incorrectly applied to plaintiff's furnace which does not constitute property under Pennsylvania law").  I disagree.

Under Pennsylvania law, the "goal in construing and applying the language of an insurance contract is to effectuate the intent of the parties as manifested by the language of the specific policy."  Pa. Nat'l Mut. Cas. Ins. Co. v. St. John, 106 A.3d 1, 14 (Pa. 2014).  The "language of the policy must be construed in its plain and ordinary sense, and the policy must be read in its entirety."  Id.  "Property" is not a term defined in plaintiff's policy.  However, the policy defines "property damage" as "physical injury to or destruction of tangible property, including loss of its use resulting from such physical injury or destruction."  Dkt. No. 14-1 at ECF p. 31.  It is clear and unambiguous that the policy exclusion does not limit plaintiff's obligation to the maintenance of his "building structure," "dwelling" or the "insured premises," all of which are terms specifically defined therein.  Id. at ECF p. 30-31.  Rather, by using the term "property," the maintenance exclusion applies to not just the external structure at 407 W. South Avenue, Glenolden, Pennsylvania, but it also includes the plumbing and the furnace.  This is consistent with the definition of property found in Black's Law dictionary:  "any external thing over which the rights of possession, use, and enjoyment are exercised." Property, Black's Law Dictionary (10th ed. 2014).

"would not have occurred if the owner had not failed to maintain the furnace in a reasonably timely manner." Dkt. No. 16-8 at ECF p. 2. He also explained that the failure of the furnace "enabled the house to freeze." Id. at ECF p. 1.

On the record before me, viewed in the light most favorable to plaintiff, I find that a reasonable jury could not conclude that Allstate breached its obligation to plaintiff in applying the maintenance exclusion to bar plaintiff's claim. There is ample evidence to support Blum's conclusion that the incident can be attributed to plaintiff's failure to sufficiently maintain the furnace. Plaintiff's own expert told him that his "furnace was in dire need of service" with a "heat exchanger and chimney [that] were almost completely clogged with debris and soot." Dkt. No. 14-21. The only evidence of maintenance having been performed on the furnace is the service sticker on the furnace which dates to 2007 and plaintiff's own testimony that he performed some maintenance on the furnace *before* he moved out in 2009: changing air filters and hiring technicians who worked on the furnace when they installed a central air system. See Dkt. No. 16 at ¶ 27.

As defendant contends, plaintiff cannot use "the fact that the lease he once had with Pepe put the responsibility of maintaining the furnace on Pepe as evidence that *he* used reasonable care to maintain his furnace." Dkt. No. 18 at ECF p. 4. "[T]he duty of Plaintiff to use reasonable care to maintain heat in the Property is a duty imposed upon *him* pursuant to the Policy that he cannot delegate to others." Dkt. No. 18 at ECF p. 5 (emphasis in original); see Husak v. Berkel, Inc., 341 A.2d 174, 1979 (Pa. Super. Ct. 1975) ("[A]n initially obligated party cannot delegate his responsibility by agreement with a third person."). Other than the lease agreement, there is no physical evidence that the furnace was serviced at all during Pepe's lease of the Property. Plaintiff has not set forth any testimony or other evidence to support a finding

-18-

that Pepe or her unnamed spouse/fiancé in fact fulfilled Pepe's obligation under her lease to maintain the property's heating system.  The only evidence of record that could support a finding that the HVAC system was maintained during Pepe's tenancy is the testimony of plaintiff's property manager that the HVAC system was working following Pepe's eviction.  Dkt. No. 16 at ¶ 18.  But this is not sufficient to either warrant summary judgment in plaintiff's favor or to support a conclusion that a material question of fact remains with respect to whether the maintenance exclusion should apply to bar plaintiff's claim.[14]

Plaintiff argues that a genuine dispute of material fact remains because there is sufficient evidence "for a reasonable juror to conclude that the discharge of water was the triggering event for the loss, and Plaintiff's furnace malfunctioned as a result of it being exposed to the leaking water."  Dkt. No. 21 at ECF p. 3.  But plaintiff has not set forth any evidence to support his theory that the furnace only malfunctioned after the leak from the second floor began.  Indeed, his own expert's conclusion does not support this argument.  And even assuming arguendo that it was the leak which then caused the furnace to fail, plaintiff has not set forth any evidence to support a finding that the incident was the result of anything other than a failure to maintain – in that case – a failure to maintain the plumbing.[15]  To prevail, plaintiff "must do more than simply show that there is some metaphysical doubt as to the material facts."  Matsushita, 475 U.S. at

---

[14]     Plaintiff also argues that the maintenance exclusion cannot apply to bar his claim, as "[t]here is no amount of maintenance Plaintiff or any other homeowner could do to prevent debris in the oil that was purchased."  Dkt. No. 16 at ECF p. 36.  I disagree.  Plaintiff submits no evidence in support of this proposition.  Rather, as Blum explained in his supplemental report, "[a]n oil-fired appliance should be routinely serviced every year.  The longer a system goes without service, the greater the chance of a clog-related failure . . . ."  Dkt. No. 17-11 at ECF p. 2.

[15]     Instead, the Court is faced with the email from plaintiff to his public adjuster in which he writes "Even if my furnace did run dry, my pipes may show a different story?  The lady renting my place had 7 women living there for almost 2 years sharing 1 bathroom.  Who knows what that kind of overuse might have done?"  Dkt. No. 14-5.

586.  Because plaintiff has not met this obligation, I will grant summary judgment in favor of defendant and against plaintiff with respect to Count I of plaintiff's complaint, his claim for breach of contract.

## II.      Bad Faith

Allstate also seeks summary judgment in its favor on plaintiff's bad faith claim against it. Plaintiff asserts his claim for bad faith pursuant to 42 Pa. Cons. Stat. Ann. § 8371, which provides a statutory remedy for the bad faith handling of insurance claims by an insurer.  To prevail on his claim, plaintiff "must show that the defendant did not have a reasonable basis for denying benefits under the policy and that the defendant knew or recklessly disregarded its lack of reasonable basis for denying the claim." Terletsky v. Prudential Prop. and Cas. Ins. Co., 649 A.2d 680, 688 (Pa. Super. Ct. 1994) (citations omitted); see also Keefe v. Prudential Prop. & Cas. Ins. Co., 203 F.3d 218, 225 (3d Cir. 2005) (adopting the definition of bad faith set forth by the Superior Court in Terletsky).  "Bad faith conduct . . . includes lack of good faith investigation into facts, and failure to communicate with the claimant." Johnson v. Progressive Ins. Co., 987 A.2d 781, 784 (Pa. Super. Ct. 2009), citing Condio v. Erie Ins. Exchg., 899 A.2d 1136, 1142 (Pa. Super. Ct. 2006).  However, an insurance company "need not show that the process used to reach its conclusion was flawless or that its investigatory methods eliminated possibilities at odds with its conclusion.  Rather, an insurance company simply must show that it conducted a review or investigation sufficiently thorough to yield a reasonable foundation for its action." Hamm v. Allstate Prop. & Cas. Ins. Co., 908 F. Supp. 2d 656, 670 (W.D. Pa. 2012).  "[M]ere negligence or bad judgment is not bad faith." Brown v. Progressive Ins. Co., 860 A.2d 493, 501 (Pa. Super. Ct. 2004).

Bad faith must be proven by clear and convincing evidence.  Terletsky, 649 A.2d at 688.

-20-

"The 'clear and convincing' standard requires a showing by the plaintiff[ ] that the evidence is so clear, direct, weighty and convincing as to enable a clear conviction, without hesitation, about whether or not the defendant[ ] acted in bad faith." Bostick v. ITT Hartford Grp., Inc., 56 F. Supp. 2d 580, 587 (E.D. Pa. 1999) (citations omitted). "Bad faith claims are fact specific and depend on the conduct of the insurer *vis à vis* the insured." Condio, 899 A.2d at 1143.

Plaintiff argues that "Allstate acted in bad faith by failing to investigate to determine the cause and origin of Plaintiff's water leak" and that "[f]ailing to inspect plaintiff's bathroom after the loss was unreasonable." Dkt. No. 16 at ECF p. 42. He also argues that his "policy does not require him to obtain annual preventative services for the furnace" but that the basis for Allstate's denial of coverage was his "failure to show Allstate proof of such service after January 2, 2007." Id. Plaintiff contends that Allstate has "inappropriate[ly] attempted to transform the policy's requirement to 'maintain heat in the building' into an obligation to perform some undefined 'service' upon the system annually." Id. at ECF p. 43.

Allstate contends that plaintiff has "failed to establish an unreasonable denial by clear and convincing evidence." Dkt. No. 14 at ECF p. 34. It argues that "based upon the evidence supplied to [it] during the adjustment of the claim (namely the reports of *both* Blum and Keegan), there was and is reasonable reliance upon an expert and a reasonable basis to deny Plaintiff's claim as there was a 'dire' lack of maintenance that resulted in a severely clogged nozzle causing the furnace to fail."[16] Id. (emphasis omitted).

---

[16] Allstate also contends that plaintiff's conduct during the adjustment of the claim "is not anywhere near in the realm of good faith conduct an insured is supposed to display during the presentation of an insurance claim" and that "[p]laintiff's own conduct can be used to mitigate against any finding of bad faith against Defendant Allstate." Id. Pennsylvania law applies "the duty to act in good faith to each party to an insurance contract, including the insured." Jung v. Nationwide Mut. Fire Ins. Co., 949 F. Supp. 353, 360-61 (E.D.Pa.1997) (quotation omitted); see also Dietz & Watson, Inc. v. Liberty Mut. Ins. Co., No. 14-4082, 2015

On the record before me, it cannot be said that Allstate had "no good reason" to deny coverage.  It was not unreasonable for Allstate to focus its claim investigation on the condition of plaintiff's furnace given that the water damage to the property occurred in January in Pennsylvania in an unoccupied property where the gauge on the oil tank read empty at the time of the loss (even though the gauge was later determined to be faulty).  See Dkt. No. 17-8 at ECF p. 3.  Plaintiff himself testified that he did not "dispute that it was water-freeze" which caused water to leak from his second floor.  Dkt. No. 17-3 at 94:20-95:12.  As defendant argues, "Blum and Keegan, ultimately, both concluded that the furnace failed due to a severely clogged nozzle . . . ." Dkt. No. 18 at ECF p. 7.  Plaintiff has not set forth any evidence to show that Allstate should have concluded to the contrary that "the discharge of water caused the furnace to malfunction and not the other way around." Dkt. No. 17-12 at ECF p. 6.  Further, plaintiff testified that he has no evidence that anyone at Allstate has any ill will towards him or that anyone at Allstate tried to influence Blum's conclusions.  Dkt. No. 14-4 at 195:21-25; 196:2-3; 196:14-17.  The record before me does not provide clear and convincing evidence of bad faith, even when viewed in a light most favorable to the non-moving party.  I will grant defendant's motion for summary judgment on Count II of plaintiff's complaint.

An appropriate Order follows.

---

WL 356949, at *9 (E.D. Pa. Jan. 28, 2015) (quotation and alteration omitted) ("Among the indicators of an insured's bad faith and collusion are unreasonableness, misrepresentation, concealment, secretiveness, lack of serious negotiations on damages, attempts to affect the insurance coverage, profit to the insured, and attempts to harm the interest of the insurer").  I need not here decide whether plaintiff met his obligation to act in good faith, but note that his correspondence with his public adjuster raises questions about whether he was sufficiently forthright with Allstate during its investigation of his claim.